IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GRAY MANUFACTURING COMPANY, INC. | : | CIVIL ACTION |
| | : | |
| | : | No. 19-899 |
| v. | : | |
| | : | |
| SEFAC S.A., et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, C.J.**                                    **March 16, 2021**

Plaintiff Gray Manufacturing Company, Inc. is suing Defendants Sefac S.A. and Sefac USA Inc. (collectively, "Sefac") for patent infringement. Gray has a patent for a portable wireless vehicle lift system, and Sefac allegedly sells a similar lift system. The parties have asked the Court to construe seven claim terms in Gray's patent: (1) "adaptive communication system"; (2) "wirelessly exchanging," "wirelessly communicate with one another," "wirelessly share data with one another" (3) "no master or slave relationship between said individual lifts," "master lift," "slave lift"; (4) "collective intelligence"; (5) "interface microprocessor," "display microprocessor"; (6) "the (microprocessor / lift system / lift / display screen) is configured"; and (7) "remote control." The parties have also agreed to constructions for two additional claim terms.[1] Following a claim construction hearing held on January 24, 2020, and for the reasons set forth below, the Court will construe the disputed claim terms as set forth herein.

## BACKGROUND

---

[1] The parties now agree on the meaning of two previously-disputed sets of terms. First, the parties agree the terms "e-stop button" and "e-stop switch" should be construed as "a button/switch that is used to activate an emergency stop system to halt the lifting or lowering of the lift." Second, the parties agree the terms "watchdog processor" and "COP watchdog" should be construed as "a processor that is able to determine whether the computer is operating properly (COP) so that corrective action may be taken if the computer is determined to be operating improperly." The Court will adopt the parties' agreed-upon definitions for both sets of claim terms.

On February 26, 2019, Gray was issued patent number 10,214,403 (the '403 patent) for a vehicle lift system. This system raises and lowers cars and other vehicles so they can be repaired. A drawing of Gray's system is below.



FIG. 1

As the drawing shows, Gray's system has four individual lifts which go under each wheel of a car.[2] Each lift is portable, so it can be easily moved and stored. The person using Gray's lift system can control the height of the car through a touch screen and buttons on the lifts. In addition to the stationary touch screen, the lift system can also include a remote control, which a person can use to control the height of the car. The remote control can be stored in a docking station on the lifts.

---

[2] For simplicity, the Court will describe how Gray's system works on a car with four wheels. The Court notes, however, that Gray's lift system can include any even number of lifts (e.g., two, four, six), and it can be used to lift items other than cars, including vehicles with more or less than four wheels.

After a person uses the remote control or the touch screen to tell the lift system to raise or lower the car, the individual lifts must communicate with one another to carry out the person's commands. Each lift must coordinate with all the other lifts to move each wheel of the car to the same height at the same time. This communication ensures the car is lifted evenly. The lifts communicate with one another wirelessly. Wireless communication is helpful because wires going between the lifts could get tangled and cause a safety hazard for the people repairing the car. The lifts can communicate with one another using an adaptive communication system. An adaptive communication system is capable of communicating on different radio channels. This communication system speeds up communication between the lifts because they are not limited to one radio channel. Instead, they can choose the least busy radio channel available for their communications.

Gray's lift system uses collective intelligence to coordinate among the individual lifts. Collective intelligence means that the lifts all share data with one another, and each lift operates using that shared data. This collective intelligence setup is different from a master/slave set up. In a master/slave set up, one lift (the master) controls the other lifts (the slaves). The master lift would receive information from the slave lifts and send information to the slave lifts, but the slave lifts would not share information with one another.

Gray's lift system also has several microprocessors. These microprocessors collect and process information. They are essentially small computers. One of the microprocessors that can be included in Gray's lift system is an "interface microprocessor" or "display microprocessor." This microprocessor interacts with the person using the lifts by, among other things, recording that person's commands.

3

In March 2019, Gray brought this lawsuit alleging Sefac violated the '403 patent by selling a lift system with the same features as Gray's lift system. The parties have filed claim construction briefs which provide competing definitions for seven terms: (1) "adaptive communication system"; (2) "wirelessly exchanging," "wirelessly communicate with one another," "wirelessly share data with one another" (3) "no master or slave relationship between said individual lifts," "master lift," "slave lift"; (4) "collective intelligence"; (5) "interface microprocessor," "display microprocessor"; (6) "the (microprocessor / lift system / lift / display screen) is configured"; and (7) "remote control." Gray argues these terms should be interpreted broadly, and therefore Sefac is violating Gray's patent. Sefac argues these terms should be interpreted narrowly and limited to specific algorithms. Under Sefac's proposed definitions, it would not be infringing on Gray's patent.

**DISCUSSION**

### I.        Claim Construction Principles

When construing a patent, a court must decide what the terms in the patent would mean to a person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). To make this decision, a court must consider the language in the patent claims. *Id.* at 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." (internal citations and quotations omitted)). A court should not use the patent's specification to limit the terms in the claims.[3] *Id.* at 1323 (noting "the danger of reading limitations from the specification into the claim[s]"). The court should, however,

---

[3] Claims and specifications are two distinct parts of a patent. The specifications "contain a written description of the invention, and of the manner and process of making and using it." 35 U.S.C. § 112(a). The claims are at the end of a patent and they "point[] out . . . the subject matter which the inventor or a joint inventor regards as the invention." *Id.* § 112(b). In other words, the claims define the scope of the invention.

use the specification to help explain the meaning of the claim terms. *Id.* at 1315 ("[C]laims must be read in view of the specification, of which they are a part." (internal citations and quotations omitted)). A court may also use other evidence to determine the meaning of claim terms, such as the patent's prosecution history, expert testimony, dictionary definitions or treatises. *Id.* at 1317, 1324. When using these sources, a court must be careful not to rewrite the patent itself because the patent is the primary source of meaning for patent terms. *Id.* at 1322–23.

While patent terms are generally not limited by the specification, there is an exception to this rule for means-plus-function terms. Means-plus-function terms are "expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112, ¶ 6. In other words, a means-plus-function term is defined by what it does rather than what it is made of. For example, "a means for holding water" would be a means-plus-function term, but "a plastic bottle" would not be a means-plus function term. Because means-plus-function terms could include many different structures (e.g. many different objects could be used to hold water), these terms are limited to the structures described in the specification. *Sony Corp. v. Iancu*, 924 F.3d 1235, 1239 (Fed. Cir. 2019).

**II.      Means-Plus-Function Analysis**

As an initial matter, none of the terms at issue in this case are means-plus-function terms, so none of the terms are limited to the structures or algorithms expressed in the specification. When the disputed claim term does not contain the word "means," there is a rebuttable presumption that § 112, ¶ 6 does not apply, meaning the term is not a means-plus-function term. *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc). This presumption can only be overcome "if the challenger demonstrates that the term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that

function.'" *Id.* at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). The party challenging the presumption bears the burden by a preponderance of the evidence. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) (citations omitted). The standard for determining "definite structure" is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348.

Sefac has not successfully rebutted the presumption that the disputed terms are not means-plus-function terms. Though Sefac only identifies the term "microprocessor" as a means-plus-function term, Sefac argues the Court must construe six of the seven disputed claim terms (all except "remote control") as means-plus-function terms because those six terms "require the operation of the microprocessor in order to meet the required function." Hr'g Tr. 51:19-22, ECF No. 50. Because each claim includes a microprocessor, Sefac argues, the term's definition must include the particular algorithm set forth in the corresponding specification. Def. Mem. 9, ECF No. 33. The Court is not persuaded. The mere use of a microprocessor does not imply that a claim term must be a means-plus-function term.[4] Rather, the question is whether Sefac has demonstrated

---

[4] In arguing otherwise, Sefac cites to *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015) for the proposition that "[w]here the patent claim describes a function that requires a 'special purpose' computer rather than a 'general purpose' computer, it is not sufficient for the specification to disclose only a general purpose computer or microprocessor." Def. Mem. 4, ECF No. 33. However, in *Williamson*, the Federal Circuit had already concluded § 112, ¶ 6 applied to the disputed term. *Id.* at 1352 ("In cases such as this, *involving a claim limitation that is subject to § 112, para. 6 that must be implemented in a special purpose computer*, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor.") (emphasis added). Only then did the *Williamson* Court require the claim term to be limited to the specific algorithms in the specification. Here, Sefac seeks to put the cart before the horse and require this Court to limit the disputed claim terms to the specific algorithms in the specification before first rebutting the presumption that the terms are not means-plus-function terms. The Court will not do so. *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020) (rejecting the argument that a general purpose computer or central processing unit must invoke § 112, ¶ 6).

the claim terms fail to recite sufficiently definite structure or else recite function without reciting sufficient structure for performing that function. *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Beyond arguing the use of a microprocessor necessarily makes the claim terms means-plus-function terms, Sefac has made no attempt to do so. Limiting the claim terms to their algorithms from the specification would therefore be improper. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (stating that reading a limitation from the written description into the claim is a "cardinal sin").

The Court also finds Sefac has not successfully rebutted the presumption that "microprocessor" itself is not a means-plus-function term. "When evaluating whether a claim limitation invokes § 112, ¶ 6, the essential inquiry remains whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Zeroclick*, 891 F.3d at 1007 (internal quotations and citation omitted). Because the specific claim terms at issue here—"interface microprocessor" and "display microprocessor"— do not use the word "means," there is a rebuttable presumption that they are not means-plus-function terms. Sefac has not explained why a person of ordinary skill in the art—an engineer here—would consider either term to be non-structural. The Court finds "microprocessor" to be sufficiently definite and § 112, ¶ 6 therefore does not apply. *See Hochstein v. Microsoft Corp.*, No. 04-73071, 2009 WL 1838975, at *9 (E.D. Mich. June 22, 2009) (declining to define "microprocessor" as a means-plus-function term).

### III.    Disputed Claim Terms

Having found none of the disputed claim terms are means-plus-function terms, the Court will now turn to defining the claim terms consistent with the interpretation of a person of ordinary skill in the art. As stated above, Sefac's definitions for all claim terms except "remote control"

incorrectly limited the claim terms to their specification, which would only be proper for a means-plus-function term. The Court will therefore decline to adopt Sefac's proposed definitions and will not discuss any of Sefac's proposed definitions except for that of "remote control."

### A.   "No Master or Slave Relationship Between Said Individual Lifts," "Master Lift," and "Slave Lift."

The claim term "no master or slave relationship between said individual lifts" means "no single lift is dedicated to controlling the lifting and lowering of the other lifts in the lift system. All the lifts control their own lifting and lowering using information shared among the lifts." This term appears in claims 1–3 and 14. Claim 1 states the lift system "is configured to perform coordinated lifting and lowering of [a] vehicle with no master or slave relationship between said individual lifts." The specification further explains "there is no master or slave relationship between the units in the ensemble each of the units is an independent operator with each unit knowing all other units' status and lift parameters via way of the common communication buffer that all units now have." '403 patent, Col. 16:21–25. In light of the language in claim 1 and the detailed description in the specification, the Court will adopt Gray's proposed definition.

Using the same analysis, the claim term "master lift" means "a lift in the lift system that is dedicated to controlling the lifting and lowering of the other lifts in the lift system." Likewise, "slave lift" means "a lift in the lift system whose lifting and lowering is controlled by a master lift." Both terms "master lift" and "slave lift" appear in claims 14, 19, and 22. All of those claims detail a method of operating the lift system "with none of said individual lifts being a master lift or a slave lift." The specification describes "the first unit in the ensemble" as "assum[ing] a pseudo master of the ensemble . . . [that] serves to pole the other units as to their ID and lifting and

command buffer data." '403 patent, Col. 15:61–65. The Court therefore agrees with Gray's proposed definition for both "master lift" and "slave lift."

**B. "Remote Control"**

The claim term "remote control" means "a device that can be used to control the operation of the lift system and can be removably attached to at least one of the lifts of the lift system." The Court's definition matches Gray's proposed definition. Sefac's proposed definition for "remote control" is "a device for manually operating at least some of the functions of the column lifts being controlled from a position remote from any of the operating lifts." Def. Mem. 8, ECF No. 33. That is, when the remote control is connected to the lift, it is no longer a *remote* control. Therefore, the crux of the parties' disagreement is whether the definition includes a device that can be attached to one of the lifts and does not *always* operate wirelessly. The Court finds that it does.

The claim term appears in claims 1, 12, and 15–17, though claims 12 and 17 are not asserted. Critically, claim 1 states that the lift system includes "a remote control configured to be removably attached to at least one of said individual lifts, wherein, when said remote control is attached [at least one of the lifts], wired communication is permitted between said remote control and [one of the lifts]." The specification also contemplates a remote control that can be attached to one of the lifts. Specifically, "a docking station that allows the remote control module to be removably attached to the lift." '403 patent, Col. 5:12–16. The specification further states the "remote control module can be used to control the lift system whether it is attached to or detached from the lift." *Id.* at Col. 5:25–27. Because the claims and specification regarding remote control are explicitly and precisely aligned with Gray's proposed definition, the Court will adopt Gray's definition and reject Sefac's.

**C. "The (Microprocessor / Lift System / Lift / Display Screen) is Configured"**

The claim term "the (microprocessor / lift system / lift / display screen) is configured" means "the (microprocessor / lift system / lift / display screen) is set up." Here, the Court is essentially asked to define what it means for something to be "configured." This term appears (in various forms) in claims 1–4, 9, 10, 14, 19, 21, and 22. Claim 1 states "an interface microprocessor [is] configured to process information related to said user interface," and further states "said lift system is configured to perform coordinated lifting and lowering of said vehicle . . . ." The specification further describes a scenario where "each of the portable lifts can be equipped with at least a first microprocessor and a second microprocessor that are configured to communicate with one another . . . ." '403 patent, Col. 13:4–11. Words of a claim should generally be "given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Given the language of the claims and specification, the Court agrees with Gray in this context that "configured" simply means "set up."

### D. "Adaptive Communication System"

The claim term "adaptive communication system" means "a communication system that is able to automatically adjust one or more of its communication parameters." This term appears in Claims 7, 14, 19, and 22. Claim 7 states that the lift system includes "an adaptive communication system capable of wirelessly communicating on a plurality of different channels." Claims 14, 19, and 22 describe "a method of operating a wireless portable vehicle lift system" by "establishing a secure wireless communication link between at least two of said individual lifts to thereby form a lift ensemble of said individual lifts that wirelessly communicate with one another via an adaptive communication system wherein said adaptive communication system is capable of operating on multiple channels." The specification further describes an "adaptive communication microprocessor" that is "configured to automatically adjust one or more communication

parameters . . . ." '403 patent, Col. 14:4–8. According to the specification, the adaptive communication system is different from "a conventional communication system" because it "is frequency agile, protocol agile, and power agile." *Id.* at Col. 12:16–21. The Court is therefore satisfied that Gray's proposed definition—a communication system that is able to automatically adjust one or more of its communication parameters—is sufficiently supported by the language in the '403 patent and the term's ordinary meaning.

**E.   "Collective Intelligence"**

The claim term "collective intelligence" means "a shared set of information." This term appears in claims 2, 14, 19, and 22. Claim 2 states "each of said individual lifts is configured to track its own actions and the actions of all other individual lifts of said lift system to thereby provide collective intelligence that enables said coordinated lifting . . . ." Claims 14, 19, and 22 each state "during said lifting [of a vehicle] said individual lifts wirelessly share data with one another so as to coordinate said lifting using collective intelligence of said lift ensemble." The specification states each lift "must be capable of tracking its own actions together with the actions of all other lifts in the group and determining as part of a collective intelligence a lift or lower strategy keeping the lifts together, maintaining a high level of safety, precision, and lift integrity." '403 patent, Col. 10:61–67. The specification further describes "the collective intelligence of the lifting ensemble" as using data such as lift height, velocity, and pressure to "effectively perform a coordinated lift or lower of the ensemble." *Id.* at Col. 11:33–41. It is clear to the Court that "collective intelligence" as described in the claims and specification refers to a shared set of information between the lifts, and therefore the Court agrees with Gray's proposed construction.

**F.   "Interface Microprocessor" and "Display Microprocessor"**

The claim terms "interface microprocessor" and "display microprocessor" mean "one or more integrated circuits that are capable of performing computer processing functions for the user interface system / display screen." These terms appear at claims 1, 14, 19, 21, and 22. As discussed above, the Court finds both terms to be sufficiently definite such that Sefac has not rebutted the presumption that they are not means-plus-function terms. Claim 1 describes "an interface microprocessor configured to process information related to said user interface" and "wherein said control microprocessor and said interface microprocessor are configured to communicate with one another, perform distinct tasks, operate in parallel, and share said memory." Claims 14, 19, and 22 describe "a display microprocessor, a control microprocessor, and a radio frequency transceiver, wherein said display microprocessor and said control microprocessor are configured to communicate with one another." Claim 22 states "said display microprocessor and control microprocessor share a common area of memory." Claim 21 states "each individual lift comprises an interface system including said display screen, said display microprocessor, and a plurality of function buttons."

The specification explains "[o]ne of the microprocessors of the lift can be the interface microprocessor that is configured to process information related to the user system" and that it "can be programmed to display at least 40, 80, 120, 160, 200, 240, 280, 320, 360, 400 unique operator interface screens on the touch screen display. '403 patent, Col. 13:50–60. The specification further describes "an interface microprocessor configured to process information related to the user interface system." *Id.* at Col. 14:33–35. Gray's proposed definition is further bolstered by the declaration if its expert, Larry Jaipul, who defines "microprocessor" as "basically one or more electronic circuits that perform computer processing functions." Pl. Mem. Ex. A 14,

ECF No. 32. Even Sefac's proposed definition acknowledges that a microprocessor is "basically a computer . . . ." Def. Mem. 14, ECF No. 33.

In addition, because the microprocessors at issue here are either "interface" or "display" microprocessors, the Court agrees the definition should be limited to "for the user interface system / display screen." Accordingly, the Court will adopt Gray's proposed definition for these terms.

### G. "Wirelessly Exchanging," "Wirelessly Communicating With One Another," and "Wirelessly Share Data With One Another"

Finally, the Court agrees with Gray that the claim terms "wirelessly exchanging," "wirelessly communicating with one another," and "wirelessly share data with one another," do not require construction and possess a plain and ordinary meaning. These terms appear at claims 14, 19, and 22. The Court is not required to construe every disputed term. *See 02 Micro Intern. Ltd. V. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Because "wirelessly" is a ubiquitous and self-defining term, the Court finds it requires no further definition beyond its plain meaning.

**CONCLUSION**

In sum, because none of the disputed terms are means-plus-function terms, and because Gray's proposed definitions comport with the '403 patent's claims, its specification, and how a person of ordinary skill in the art would interpret the terms, the Court will adopt Gray's proposed constructions.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.